UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                  :
ANTONINA MATTIOLI                 :
                                  :
v.                                :  CIV. NO. 3:14CV182 (HBF)
                                  :
COMMISSIONER OF SOCIAL SECURITY   :
```

<u>**RECOMMENDED RULING ON CROSS MOTIONS**</u>

Plaintiff Antonina Mattioli brings this action pursuant to 42 U.S.C. §405(g), seeking review of a final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §401 <u>et seq</u>. and Title XVI Supplemental Security Income ("SSI"). Plaintiff has moved to remand the case for a rehearing, while the Commissioner has moved to affirm.

For the reasons set forth below, plaintiff's Motion for Summary Judgment seeking remand for a rehearing [**Doc. #18**] is **DENIED.** Defendant's Motion for Order to Affirm the Decision of the Commissioner [**Doc. #20]** is **GRANTED.**

## I. ADMINISTRATIVE PROCEEDINGS

Plaintiff filed applications for SSI and DIB on June 4, 2010, alleging disability as of June 30, 2009. [Certified Transcript of the Record, Compiled on March 24, 2014, (hereinafter "Tr.") 149-52; 153-59]. The record indicates that the application for DIB was denied at the initial level and the claim closed on July 8, 2010. [Tr. 51; 60; 162]. The record does not indicate whether any action was taken on the SSI

application in 2010 and a later worksheet does not acknowledge that the application was filed. {Tr. 162].

Plaintiff filed second DIB and SSI applications on June 20, 2011, alleging disability based on hypothyroidism, Lyme disease and diabetes with an alleged onset date of January 1, 2011.[1]  Her claim was denied initially and upon reconsideration.  [Tr. 50-58; 59-67; 70-78; 79-87; 90-93; 94-97].  Plaintiff requested a timely hearing before an ALJ on November 29, 2011.  [Tr. 113-14].  On September 4, 2012, Administrative Law Judge Ronald Thomas held a hearing at which plaintiff appeared with counsel.  [Tr. 34-49].  On September 21, 2012, the ALJ found that plaintiff was not disabled, and denied her claims.  [Tr. 17-33].

On December 11, 2013, the Appeals Council denied review, thereby rendering ALJ Thomas' decision the final decision of the Commissioner.  [Tr. 1-6].  The case is now ripe for review under 42 U.S.C. §405(g).

Plaintiff, represented by counsel, timely filed this action for review and moves to remand the case for rehearing.

## II.  STANDARD OF REVIEW

The scope of review of a social security disability determination involves two levels of inquiry.  The court must first decide whether the Commissioner applied the correct legal principles in making the determination.  Next, the court must decide whether the determination is supported by substantial

---

[1] The second applications are not included in the record.  This information is taken from the Disability Determination Explanation and Full DIB Review Sheet.  [Tr. 50, 59, 162].

evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).
Substantial evidence is evidence that a reasonable mind would
accept as adequate to support a conclusion; it is more than a
"mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401
(1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998).  The
substantial evidence rule also applies to inferences and
conclusions that are drawn from findings of fact.  Gonzales v.
Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v.
Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may
not decide facts, reweigh evidence, or substitute its judgment
for that of the Commissioner.  Dotson v. Shalala, 1 F.3d 571,
577 (7th Cir. 1993).  The court must scrutinize the entire record
to determine the reasonableness of the ALJ's factual findings.
In reviewing an ALJ's decision, the court considers the entire
administrative record.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir.
1996).  The court's responsibility is to ensure that a claim has
been fairly evaluated.  Grey v. Heckler, 721 F.2d 41, 46 (2d
Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ
applied correct legal principles, application of the substantial
evidence standard to uphold the ALJ's decision "creates an
unacceptable risk that a claimant will be deprived of the right
to have her disability determination made according to the
correct legal principles."  Schaal v. Apfel, 134 F.3d 496, 504
(2d Cir. 1987).  To enable a reviewing court to decide whether
the determination is supported by substantial evidence, the ALJ
must set forth the crucial factors in any determination with

3

sufficient specificity.  Ferraris v. Heckler, 728 F.2d 582, 587
(2d Cir. 1984).  Thus, although the ALJ is free to accept or
reject the testimony of any witness, a finding that the witness
is not credible must nevertheless be set forth with sufficient
specificity to permit intelligible review of the record.
Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d
Cir. 1988).  Moreover, when a finding is potentially dispositive
on the issue of disability, there must be enough discussion to
enable a reviewing court to determine whether substantial
evidence exists to support that finding.  Peoples v. Shalala,
No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. 1994); see
generally Ferraris, 728 F.2d at 587.

     Under the Social Security Act, every individual who is
under a disability is entitled to disability insurance benefits.
42 U.S.C. §423(a)(1).  "Disability" is defined as an "inability
to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can
be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The SSA has
promulgated regulations prescribing a five step analysis for
evaluating disability claims.  "In essence, if the Commissioner
determines (1) that the claimant is not working, (2) that he has
a "severe impairment," (3) that the impairment is not one
[listed in Appendix 1 of the regulations] that conclusively
requires a determination of disability, and (4) that the
claimant is not capable of continuing in his prior type of work,

4

the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); see also Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); 20 C.F.R. §§404.1520(b-f), 416.920(b-f).

The burden of proving initial entitlement to disability benefits is on the claimant.  Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981).  The claimant satisfies this burden by showing that impairment prevents return to prior employment. Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).  The burden then shifts to the Commissioner, who must show that the claimant is capable of performing another job that exists in substantial numbers in the national economy.  20 C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

### III. MEDICAL EVIDENCE

Plaintiff was born on May 12, 1953, and was fifty-seven years old on the date of alleged onset of her disability, January 1, 2011.  [Tr. 37].

Plaintiff completed college in Russia.  [Tr. 38].  In the United States, she previously worked as a housekeeper (1999-2000) and aide/companion (2001-04, 2007-10).  [Tr. 34; 169-70; 174; 176-77; 190].  Plaintiff remained insured for purposes of the Social Security disability insurance benefits program through December 31, 2011.  [Tr. 178].

Plaintiff claims she is disabled on the basis of hypothyroidism, Lyme disease, diabetes, and depression. [Tr. 70-

5

71].

A.   *Medical Records*

    1.   **Dr. Boris Mayzler**

Plaintiff's primary care physician is Boris Mayzler. D.O.

On December 13, 2010, Dr. Mayzler wrote a letter confirming plaintiff suffered from hypertension and Lyme disease and had experienced these conditions for eighteen months.  She had no symptoms of Lyme disease and her hypothyroidism was being successfully managed.  There was no mention of diabetes.  [Tr. 501].  A state epidemiology and infectious disease reporting form indicated that, in the year 2010, plaintiff first experienced symptoms of Lyme disease in September.  [Tr. 498; 518].

On February 24, 2011, plaintiff saw Dr. Mayzler complaining of pain all over her body.  Progress notes indicate a normal physical exam.  Dr. Mayzler did not indicate any musculoskeletal pain in the progress notes and diagnosed depression.  [Tr. 295; 495].

On February 28, 2011, plaintiff saw Dr. Mayzler complaining of depression and chest pain.  Dr. Mayzler referred plaintiff for a stress test; he did not conduct an examination.  His assessment was hypertension, depression and chest pain.  [Tr. 294; 494].  The stress test was conducted on March 1, 2011. Plaintiff exhibited decreased exercise tolerance as a result of a tearful anxiety attack, hyperventilation and complaints of leg and back pain.  The conclusion was an inadequate nondiagnostic

test.  [Tr. 292; 491].

On April 5, 2011, plaintiff saw Dr. Mayzler for an ear ache that began the day before.  He prescribed Motrin and Floxin but did not examine her.  [Tr. 484].

On June 23, 2011, Dr. Mayzler referred plaintiff to Stamford Hospital for physical therapy to address her complaints of back pain.  [Tr. 308-09].

Plaintiff saw Dr. Mayzler on September 2, 2011.  He did not conduct a physical examination.  Dr. Mayzler assessed hypertension and hypothyroidism and prescribed Melformin, Synthroid and Benicar.  [Tr. 322; 428].  Blood tests showed high levels of glucose cholesterol, as well as slightly high white and red blood cell counts.  [Tr. 476].

On September 9, 2011, plaintiff saw Dr. Mayzler.  After an unremarkable examination, Dr. Mayzler's impression was glucose intolerance and hypothyroidism.  He prescribed Melformin and Synthroid and ordered a chest x-ray.  [Tr. 321; 427].

After a cursory examination on September 23, 2011, Dr. Mayzler diagnosed joint pain and hypertension and ordered x-rays.  The examination notes do not reference musculoskeletal pain.  [Tr. 320; 426].  The x-rays showed normal chest, right and left hands, right and left elbows, and right and left knees. [Tr. 324-30; 466-72].

On October 10, 2011, Dr. Mayzler saw plaintiff for hypothyroidism.  [Tr. 425].  Plaintiff saw Dr. Mayzler on December 5, 2011 with complaints of generalized pain.  Dr. Mayzler's impression was depression and non-specific generalized

pain.  The examination note contains no reference to musculoskeletal pain.  [Tr. 424].

In January 2012, Dr. Mayzler saw plaintiff for a fungal rash, [Tr. 421], and gluteal abscess [Tr. 422-23].  On March 9, 2012, plaintiff reported that she had fallen but had not lost consciousness.  Her blood pressure was 154/92.  The examination was otherwise unremarkable.  Dr. Mayzler's assessment was hypertension and dizziness.  [Tr. 420].  An abdominal ultrasound performed on March 12, 2012, was negative.  [Tr. 434].

Dr. Mayzler examined plaintiff on April 13, 2012. Plaintiff's blood pressure was slightly elevated.  Although he noted no musculoskeletal pain on the progress note, he diagnosed arthritis and hypertension.  Dr. Mayzler ordered a uric acid test to check for gout.  The test was unremarkable.  [Tr. 419; 432].

On April 26 and May 11, 2012, Dr. Mayzler saw plaintiff but did not examine her.  On April 26, 2012, Dr. Mayzler's assessment was "?Fibromyalgia."  On May 11, 2012, he repeated the assessment.  He prescribed Savella, a medication to treat fibromyalgia in adults.  [Tr. 416; 418].  Dr. Mayzler examined plaintiff on May 4, 2012.  After an unremarkable examination, his assessment was lower extremity pain.  He did not diagnose fibromyalgia.  [Tr. 417].  Dr. Mayzler made no notation of musculoskeletal pain on any date.

On May 7, 2012, plaintiff underwent a bilateral lower extremity venous ultrasound test.  There was no evidence of venous thrombosis.  [Tr. 429].  The following day, plaintiff

8

underwent a CT brain scan to address her complaints of headaches and dizziness.  The test was unremarkable.  [Tr. 430].

### 2.  **Dr. Christine Naungayan**

Plaintiff received mental health treatment at Optimus Health Care with psychiatrist Dr. Christine Naungayan and psychiatric social worker Robert Pernice from November 2010 through May 2012.

Initial Diagnostic Evaluation

Plaintiff's initial diagnostic evaluation was conducted on November 19, 2010.  [Tr. 378-81].  Plaintiff reported intermittent depressive symptoms for several years that worsened in March or April 2010.  Plaintiff lost her job as a companion to an elderly person in January or February 2010.  Plaintiff described her symptoms as low energy, lack of motivation, sleep disturbance, increased appetite, poor short-term memory and concentration, and crying spells.  Plaintiff reported feeling anxious, which she described as "shaking inside," and experiencing shortness of breath.  [Tr. 378].

Plaintiff stated that she has occasional suicidal ideations.  She thinks about crashing her car but is deterred by the thought of hurting others.  She reported occasional auditory hallucinations.  She hears a voice talking to her quickly but has difficulty understanding what the voice is saying and tries not to listen to it.  Plaintiff denied any past depressive episodes.  Plaintiff stated that she attempted suicide at age 12 because she missed her father who died the previous year.  [Tr.

378].

Plaintiff reported treatment by Dr. Boris Mayzler, her primary care physician, for hypertension, diabetes and hypothyroidism.  She denied any substance or alcohol abuse but admitted to social drinking and smoking one pack of cigarettes a day.  [Tr. 378].  Married three times, she was then a widow. Plaintiff has two children.  Her daughter lives in Trumbull, Connecticut; her son in Estonia.  Plaintiff frequently sees her daughter and grandchildren.  [Tr. 379].

Plaintiff stated that she lived alone and had no leisure activities since the onset of her depression.  Plaintiff was alert and oriented.  Her thought processes were linear and goal-directed.  Plaintiff's attention, concentration, judgment, immediate recall and remote memory were intact, but she had some problem with recent memory.  Plaintiff's affect was tearful and she was unable to describe her mood, claiming to feel empty. [Tr. 379].  The reviewer determined that plaintiff did not pose an immediate risk of suicide.  [Tr. 381].  Plaintiff was assigned a GAF score of 51.[2]  [Tr. 380].

An initial multidisciplinary treatment plan was completed the same day.  Plaintiff was established on a monthly medical evaluation schedule to treat her reported consistent symptoms of major depression with suicidal ideation and auditory hallucinations.  The reviewer noted that plaintiff's mood had

---

[2]Plaintiff states that Dr. Naungayan assigned the GAF score.  See Doc. #22 at 11.  The Initial Diagnostic Evaluation report from which this information is taken, however, is unsigned and does not identify the evaluator.  [Tr. 378-80].

10

worsened after she lost her job.  [Tr. 390].

Initial Medical Evaluation

Plaintiff reported for an initial medical evaluation with Dr. Naungayan on November 23, 2010.  She complained of depression with some anxiety and feelings of dread.  Her main symptoms were lack of energy, listlessness, excessive sweating, tearfulness, memory loss, body aches, not feeling well and diarrhea.  Plaintiff's physical symptoms were being treated by her primary care physician, who had referred her to Dr. Naungayan for the complaints of depression and other recent symptoms.  Dr. Naungayan noted that plaintiff's psychiatric symptoms may be the result of her medical conditions.  [Tr. 373].

Plaintiff's affect was tearful and dysphoric, but appropriate as to content.  Although tearful and mildly distressed, plaintiff was pleasant.  Her thought processes were linear, logical, goal-directed and future-oriented.  Her insight was fair.  Plaintiff agreed to try taking anti-depressant medication.  Plaintiff complained of memory difficulties and stated she found it hard to focus.  She admitted to having aggressive thoughts but denied current suicidal or homicidal ideations.  Plaintiff admitted past passive suicidal ideation. Plaintiff denied auditory or visual hallucinations and displayed no other signs or symptoms of psychosis.  Dr. Naungayan diagnosed a major depressive disorder, single episode, that was severe with psychotic behavior.  She prescribed Abilify and Prozac. [Tr. 373].

Treatment Notes

Plaintiff saw Dr. Naungayan monthly from December 2010 through May 2012.  Although plaintiff admitted experiencing auditory hallucinations and suicidal ideations during the initial meetings, at ever session, Dr. Naungayan noted no suicidal or homicidal ideation, no hallucinations and no signs or symptoms of psychosis.  Plaintiff's though processes consistently were logical and goal-directed.  [Tr. 257-63; 357-71; 382-85; 408-10].

On December 7, 2010, plaintiff reported to discuss her progress.  Plaintiff stated that she had recent shoulder surgery and was taking pain medication.  She was afraid to take the prescribed Prozac.  As a result, there was little to no improvement in her mood.  Dr. Naungayan explained to plaintiff that Prozac was non-narcotic and safe to take.  The doctor also explained that the medications take time to act and, as plaintiff had not been taking the medications for several weeks, there was no improvement to her mood.  Plaintiff was encouraged to comply with her prescribed medication regimen.  Dr. Naungayan added a diagnosis of major depressive affective disorder, recurrent episode of moderate degree.  [Tr. 372].

On December 14, 2010, plaintiff reported that she felt much better.  Dr. Naungayan opined that the change may be attributed to Prozac because plaintiff indicated that she now was taking her medication regularly.  Dr. Naungayan indicated that plaintiff's severe hypothyroidism, which was recently corrected by medication, may have contributed to plaintiff's mood

12

disturbance.  At this session, plaintiff was pleasant and engaging.  Her affect was brighter.  Plaintiff stated that she was looking forward to the holidays and was feeling more hopeful about the future.  Plaintiff's only complaint was insomnia.  Dr. Naungayan prescribed Trazadone for improved sleep.  [Tr. 371].

On January 11, 2011, plaintiff reported doing intermittently better.  She stated that, on most days, her mood is improved.  She continues to feel tearful and despondent, but these episodes have decreased in frequency.  She appeared pleasant and calm with a euthymic affect.  Dr. Naungayan augmented plaintiff's anti-depressant with Cytomel.  [Tr. 263; 370].

On February 8, 2011, plaintiff reported feeling "out of sorts" and was going to consult her endocrinologist to determine if the feeling was related to her medication.  Plaintiff stated that she continued to experience tearfulness and struggled with depression.  She was pleasant and calm but her affect was dysthymic and tearful.  Plaintiff appeared physically more groomed than on her previous visit.  [Tr. 262; 369].

On March 2, 2011, plaintiff reported complaining of back pain.  She was referred to her primary care doctor.  [Tr. 265].

On March 8, 2011, plaintiff reported general improvements; she had more energy and was more hopeful regarding the future. She was less tearful.  Dr. Naungayan attributed the change to a combination of psychotropic medication and an adjustment to plaintiff's thyroid medication.  Plaintiff was pleasant and calm; her affect was brighter and more engaging.  [Tr. 261;

368].  A treatment plan review completed on March 8, 2011,
indicates that plaintiff reported increased major depressive
symptoms since losing her job.  Plaintiff reported that she
continued to feel fearful and depressed but had a "bright mood"
at times.  [Tr. 375].

On April 5, 2011, plaintiff again reported an improvement
in mood.  She stated that she no longer is tearful all of the
time and can enjoy life and her daughter.  Plaintiff appeared
pleasant and calm with a brighter affect.  Plaintiff was more
spontaneous.  [Tr. 260; 367].

On May 3, 2011, plaintiff was tearful as a result of a
party given by her neighbors at which they played loud music.
Plaintiff indicated that her depression was constant most of the
time.  However, when a stressful event occurs, she becomes
destabilized and has a difficult time recovering.  Plaintiff's
friend has reached out to her and plaintiff has tried to stay in
contact with her daughter.  Plaintiff appeared pleasant, but
tearful.  She remained engaged throughout the visit and felt
relief at the end.  [Tr. 259; 366].

On May 18, 2011, plaintiff reported feeling better.  Her
neighbors had agreed to stop playing loud music and she was
getting along better with her daughter.  Plaintiff appeared
pleasant, well-groomed and had a brighter affect.  [Tr. 258;
365].

At the June 14, 2011 visit, plaintiff was tearful.  She
stated that her "other doctor" was using her as a guinea pig
with medical students; he would not talk to her or spend time

14

with her.  Plaintiff otherwise was pleasant.  She reported that she was taking vitamins, trying to go out of the house more and wanted to lose weight.  [Tr. 257; 364].

A treatment plan review was completed on June 20, 2011. Plaintiff remained clinically stable and improved.  Plaintiff attributed her improvement to psychotropic medications and adjustment of her hypothyroid medication.  The reviewer noted that plaintiff continued to benefit from her current level of outpatient treatment.  [Tr. 388].

In July 2011, plaintiff informed Dr. Naungayan that she had an opportunity to see her son.  She was looking forward to the overseas trip.  Plaintiff reported that her bank account was improperly debited.  Although the error was corrected, plaintiff was tearful when recounting the incident.  Plaintiff was advised to focus on the fact that all was now well because the problem had been corrected and not to obsess about why the error had occurred.  During the session, plaintiff was mildly tearful, but her affect was otherwise appropriate.  She was calm and pleasant.  As the session progressed, plaintiff smiled more. [Tr. 363].

On September 7, 2011, Dr. Naungayan noted that plaintiff was doing well and had no new issues.  The doctor opined that plaintiff's physical symptoms may be related to her thyroid condition or diabetes and noted that plaintiff was consulting with her primary care physician on those issues.  Dr. Naungayan discussed a diabetic diet with plaintiff and emphasized the importance of eating several small meals rather than one large

meal each day.  Plaintiff was calm and pleasant with an
appropriate affect.  [Tr. 362].

In October 2011, Dr. Naungayan again noted that plaintiff
was doing well.  She was attending individual therapy sessions
with Mr. Pernice.  Plaintiff's mood was improved and she had no
new complaints or issues.  Her affect was appropriate.  [Tr.
361].

In November 2011, Dr. Naungayan prescribed a small dose of
Ritalin to improve plaintiff's focus and attention and
considered augmenting her anti-depressant.  The doctor noted
that plaintiff should be monitored for increased anxiety.
Plaintiff was pleasant and calm with an appropriate affect.  Dr.
Naungayan added a diagnosis of major depressive affective
disorder with recurrent episodes of severe degree without
psychotic behavior. [Tr. 360].

Plaintiff continued to be tearful in December 2011, but was
hopeful that good things would happen in her life.  Plaintiff
was compliant with all medications and treatment.  She appeared
pleasant and calm.  [Tr. 359].

Plaintiff saw Dr. Naungayan in January 2012.  Plaintiff
reported that she continued to do well and was trying to think
positively.  Plaintiff said that meeting with Mr. Pernice to
discuss her thought processes was helpful and considered herself
slightly better.  [Tr. 358; 385].

A treatment plan review completed on February 1, 2012,
noted that plaintiff continued to complain of symptoms of
depression and anxiety but indicated that plaintiff was

benefitting from her current level of outpatient treatment.
[Tr. 386-87].  On February 15, 2012, plaintiff reported feeling
better overall.  She continued to meet with Mr. Pernice.
Although she had some physical complaints, she reported that
recent medical tests were negative.  Plaintiff was calm and
pleasant with an appropriate affect.  Dr. Naungayan increased
plaintiff's dosage of Prozac.  [Tr. 384].

On March 8, 2012, Dr. Naungayan noted that plaintiff was
doing well but continued to feel depressed at times.  The doctor
prescribed Ritalin to brighten her mood.  Plaintiff's affect was
appropriate.  [Tr. 357; 383; 410].

In a March 19, 2012 letter submitted with the medical
records, Mr. Pernice notes that plaintiff described significant
anxiety with episodic panic.  He characterized plaintiff as an
individual who experiences "profound psychiatric symptoms in
response to a traumatic event or ongoing situational stress."
[Tr. 355].  Mr. Pernice noted that plaintiff has reported to the
hospital several times complaining of chest pain and difficulty
breathing but repeated testing determined that there is no
medical pathology underlying her psychological distress.  [Tr.
355].

Plaintiff saw Dr. Naungayan again on April 5, 2012.
Plaintiff reported having good and bad days, but was doing well
and had no new issues or complaints.  Her meetings with Mr.
Pernice were going well.  Plaintiff was pleasant and calm, with
appropriate affect.  In late March, Dr. Naungayan added a
diagnosis of unspecified anxiety.  [Tr. 382; 409].

17

In May 2012, Dr. Naungayan noted that plaintiff was doing well, but continued to feel anxious and overwhelmed at times with intermittent low mood.  Plaintiff thought the Ritalin helped to brighten her mood and improved her focus.  Plaintiff was pleasant and calm with appropriate affect.  [Tr. 408].

<u>Mental Impairment Questionnaires</u>

In October 2011, Dr. Naungayan and Mr. Pernice completed a mental impairment questionnaire.  [Tr. 338-42].  They had seen plaintiff biweekly since November 2010.  Over the treatment period, plaintiff showed slight improvement.  Plaintiff had been prescribed Cytomel, Prozac and Trasodone for a major depressive affective disorder.  [Tr. 339].

Plaintiff initially presented with significant symptoms of depression and anxiety.  She had no significant history of mental illness.  Plaintiff had a moderately dysphoric mood and affect and displayed intermittent tearfulness.  Although oriented and alert, plaintiff's attention and concentration remain compromised.  [Tr. 339].  Plaintiff denied hallucinations, delusions or obsession, but had intermittent suicidal ideations.  Her judgment and insight were unimpaired.  [Tr. 340].

The treatment providers rated plaintiff's functional abilities.  Regarding activities of daily living, plaintiff had no problem taking care of personal hygiene, caring for her physical needs and using good judgment regarding safety and dangerous circumstances.  She had a slight problem using appropriate coping skills to meet the ordinary demands of a work

environment and handling frustration appropriately.  [Tr. 340].

Plaintiff had no problem with any aspects of social interaction.  The treatment providers described plaintiff as pleasant and cooperative.  She could interact appropriately with others in a work environment, ask questions or seek assistance if needed, respond appropriately to others in authority, and get along with others without distracting them or exhibiting behavioral extremes.  [Tr. 341].

Plaintiff was considered well-organized cognitively and had the capacity to initiate and complete tasks.  She had no problem carrying out single-step instructions and only a slight problem carrying out multi-step instructions, focusing long enough to complete assigned simple activities or tasks, and changing from one simple task to another.  [Tr. 341].

In November 2011, Dr. Naungayan and Mr. Pernice provided a second mental impairment questionnaire.  [Tr. 346-53].  The information provided is the same as in the first questionnaire with the added notation that plaintiff exhibits decreased motivation and fatigue.  [Tr. 351].

### 3.  **Pain Clinic**

On March 2, 2011, plaintiff was seen by Dr. Sherman Bull at the Stamford Hospital pain clinic for complaints of back pain. [Tr. 274; 296; 496; 504].  Plaintiff described the pain as dull, aching, throbbing, sharp and stabbing depending on her activity. She indicated the pain was in her lower back, neck and all limbs.  Plaintiff stated that the pain was always present and rated it as 9/10.  [Tr. 275; 291; 297; 490].  Upon examination,

plaintiff displayed normal range of motion of the lumbar and
cervical spine without concordant pain as well as a full range
of motion and full strength of upper and lower extremities
bilaterally.  Dr. Bull noted tenderness to palpation of the
upper and lower extremities in more than eleven of eighteen
areas of the body symmetrically.  [Tr. 275; 291; 297; 490].  Dr.
Bull stated that plaintiff had chronic myofascial pain without
any neurological deficits that was more consistent with
fibromyalgia.  He opined that plaintiff would benefit from pain
medication and anti-depressants and prescribed Mobic,
Cyclobenzaprine and Lexapro.  [Tr. 275; 291; 297; 277-78; 289-
90; 490].  The record does not indicate that plaintiff ever
returned to the pain clinic.

### 4.   Endocrine Clinic

On June 2, 2011, Dr. Mayzler referred plaintiff to the
endocrine clinic at Stamford Hospital to evaluate her
hypothyroidism.  She was seen by Dr. Noel Robin.  [Tr. 267-269;
280-82; 287; 306; 479-81; 486-89].  Plaintiff reported
experiencing chronic generalized pain for the past eighteen
months associated with depression.  Dr. Mayzler sent her to the
clinic to determine whether hypothyroidism contributed to the
pain.  Plaintiff reported that the pain was constant.  It was
minimally relieved by Motrin and two medications prescribed by
the pain clinic.  Plaintiff stated that she no longer took these
medications and could not identify them.  Plaintiff related many

other non-specific complaints including memory problems, headaches, chronic cough, fatigue, sleep difficulties and excessive sweating.  Plaintiff became tearful several times during the examination.  Plaintiff reported that she had stopped working a year earlier because of pain and depression.  [Tr. 267; 282; 303; 481].

At the time of this examination, plaintiff was taking the following medications:  Levothyroxine, Fluoxetine, Benicar, Aripiprazole/Abilify and Metformin.  [Tr. 268; 270; 304; 480].

The examining physician noted that plaintiff was in no acute distress, although she was tearful intermittently during the examination.  [Tr. 268; 281; 304; 480].  Plaintiff's thyroid panel was normal with no signs of hypothyroidism on examination.  The doctor ruled out hypothyroidism as a cause of plaintiff's pain and posited that the pain and generalized complaints were secondary to depression.  He recommended that plaintiff follow-up with her psychiatrist.  [Tr. 269; 280; 305; 479].

### 5.  **Emergency Room Visits**

On November 29, 2010, plaintiff went to the Emergency Room complaining of right flank pain.  All test results were negative.  Plaintiff was discharged with directions to alternate Tylenol and Motrin for the pain and was provided a Lidoderm patch for pain.  She was directed to see her primary care physician within the next day or two and to return if she

experienced fever, vomiting or worsening symptoms.  [Tr. 523].

On January 3, 2012, Dr. Mayzler referred plaintiff to Stamford Hospital for complaints of chest pain. Plaintiff had experienced sharp chest pain on the left side radiating to the left arm.  Plaintiff experienced nausea, but did not vomit.  She had no clear shortness of breath.  Plaintiff was given medication in the emergency room and the pain resolved. Plaintiff was held for 24-hour observation and released.  [Tr. 405-06; 452-53].  Chest x-rays did not indicate a source of plaintiff's complaints.  [Tr. 462].  On January 8, 2012, plaintiff was treated at Stamford Hospital for alcohol intoxication.  [Tr. 461].

On February 8, 2012, plaintiff reported to the Stamford Hospital Emergency Room complaining of dizziness over the past few days.  Plaintiff stated that she was unable to walk without holding onto furniture or the wall.  She did not fall and had not lost consciousness or experiences nausea or vomiting.  At the hospital, plaintiff stated that she no longer was dizzy but complained of chest pain or pressure that radiated to her back. [Tr. 439].  The examination was normal.  Treatment providers recommended ruling out transient ischemic attack and myocardial infarction.  [Tr. 440].

A carotid ultrasound was normal.  [Tr. 442].  The MRA of the neck was unremarkable.  There were areas of stenosis within

both mid-posterior cerebral arteries but this result could have been artifactual. [Tr. 443-44]. An MRI of the brain showed no evidence of acute infarct, intracranial hemorrhage, mass effect or midline shift. [Tr. 445-46]. A chest and abdominal CT taken the preceding day showed no evidence of pulmonary emboli or thoracic aortic aneurysm. The abdominal artery was normal with no evidence of aneurysm or dissection. [Tr. 447-48]. A chest x-ray, also taken on February 7, 2012, was normal. [Tr. 450]. An axial noncontrast imaging of the skull showed no evidence of acute intracranial pathology. [Tr. 449].

Emergency response personnel brought plaintiff to Stamford Hospital Emergency Room on June 10, 2012, because she "took too many pills." [Tr. 413]. Plaintiff had called a suicide hotline and asked how many pills she could take to make her happy and how many pills would be too many. Plaintiff reported that she did not intend to commit suicide; she only wanted to be happy. Hospital staff determined that plaintiff had taken between 5 and 10 Klonopin pills with alcohol. She was admitted for 24-hour monitoring. [Tr. 413-15].

On August 20, 2012, plaintiff reported to the Stamford Hospital Emergency Room complaining of weakness, headaches and neck pain. She later added complaints of chest pain. Plaintiff was treated and released. [Tr. 565-68].

23

6.   **Cardiologist**

On January 5, 2012, following her hospital discharge, plaintiff was seen by a cardiologist, Dr. Thomas Nero. Plaintiff could not recall whether she experienced any other chest pain because she was anxious about a scratch on her car. Since her discharge, plaintiff reported no difficulty walking and experienced no lightheadedness, dizziness or palpitations. Dr. Nero's impression was unspecified chest pain, mixed hyperlipidemia and benign hypertension without heart failure. He recommended an exercise stress test and echocardiogram. [Tr. 397-98; 454-55]. The myocardial rest and stress test was normal. [Tr. 437-38; 456-57]. The echocardiogram showed impaired relaxation and mild aortic regurgitation. [Tr. 458-60].

On March 13, 2012, plaintiff returned to Dr. Nero for complaints of chest pain. Plaintiff stated that she had been hospitalized in February for chest pain. Since her release, she experienced intermittent chest pain and pressure as well as dizziness. Dr. Nero noted that all test were negative for arrhythmia. Plaintiff had normal stress tests and imaging. Dr. Nero did note that plaintiff suffers from significant anxiety. Dr. Nero's impressions were unspecified chest pain, mixed hyperlipidemia, benign hypertension without heart failure and dizziness and giddiness. Although plaintiff had multiple

24

cardiac risk factors, Dr. Nero told plaintiff it was unlikely that her symptoms represented ischemic coronary artery disease. [Tr. 393-95; 435-36].

### 7.   **Miscellaneous Medical Records**

In September 2010, a gynecological examination revealed an enlarged lymph node.  [Tr. 546].  On December 1, 2010, plaintiff underwent the surgical removal of an enlarged lymph node from her right underarm.  [Tr. 515-17, 524-27; 550-51].

Plaintiff underwent x-rays of the shoulders, elbows, hands and knees on December 20, 2010.  [Tr. 506-13].  The record does not identify the doctor who ordered the tests.  The x-rays revealed mild degenerative changes in the right shoulder, [Tr. 506], mild acromial spurring in the left shoulder, [Tr. 507], mild degenerative narrowing at the first metacarpophalangeal joint of the left hand, [Tr. 508], mild to moderate degenerative changes at the first metacarpophalangeal joint of the right hand, [Tr. 513], very minimal early osteoarthritic changes to the left knee, [Tr. 511], and minimal to mild osteoarthritic changes to the right knee, [Tr. 512].  The studies of plaintiff's elbows were unremarkable.  [Tr. 509-10].

8.   **Physical Therapy**

On June 23, 2011, Dr. Mayzler referred plaintiff for physical therapy to address her complaints of pain.  [Tr. 308-09; 477].  During her initial evaluation, plaintiff states that she avoided sitting, standing and walking because of the pain, which she rated as constant at a level of 6-7 out of 10.  The treatment plan included therapeutic exercise, manual therapy, electrical stimulation, massage and treatment with heat and cold, as well as self-care and a home program.  Plaintiff was scheduled to attend therapy twice a week for eight weeks.  [Tr. 315; 478].  Plaintiff failed to attend any appointment after the first and did not return phone calls.  She was discharged from the program on July 27, 2011.  [Tr. 311-16; 335; 477].

B.   *Questionnaires and Consultative Reports*

1.   Diabetes Mellitus Questionnaire

On June 18, 2012, Dr. Mayzler completed a Diabetes Mellitus Questionnaire.  [Tr. 552-55].  He rated plaintiff's prognosis as guarded.  Dr. Mayzler listed plaintiff's symptoms as fatigue, general malaise, hot flashes, sweating, difficulty thinking and concentrating, rapid heartbeat/chest pain, dizziness or loss of balance, headaches and nausea.  He noted that emotional factors contribute to the severity of plaintiff's symptoms and functional limitations.  [Tr. 552].  Dr. Mayzler opined that plaintiff's symptoms often are severe enough to interfere with

26

attention and concentration and that she was limited in her ability to deal with work stress.  [Tr. 553].

Dr. Mayzler opined that plaintiff could walk two city blocks before she needed to rest.  She could sit for more than two hours at one time but could stand for only fifteen minutes at one time.  [Tr. 553].  During an eight-hour workday with normal breaks, plaintiff was able to stand or walk less than two hours.  Despite saying that plaintiff could sit for more than two hours at one time, Dr. Mayzler indicated she could sit for a total of less than two hours in an eight-hour workday. Plaintiff requires a job which allows her to shift at will among sitting, standing and walking.  She also requires unscheduled breaks of 15-20 minutes every 1-2 hours.  [Tr. 554].

Dr. Mayzler stated that plaintiff can occasionally lift less than ten pounds and never lift anything heavier.  He also opined that plaintiff had significant limitations in doing repetitive reaching, handling or fingering.  [Tr. 554]. Plaintiff could use her hands, arms and fingers only 15% of the time during a normal workday and could bend and twist only 5% of the time.  Plaintiff should avoid exposure to extreme heat and cold, high humidity, fumes and dusts, soldering fluxes, solvents and cleaners, and chemicals.  Dr. Mayzler noted that plaintiff's impairments were likely to produce good and bad days and would cause her to be absent from work more than twice a month.  [Tr.

555].

### 2. Thyroid Disorder Questionnaire

On June 18, 2012, Dr. Mayzler also completed a Thyroid Disease Questionnaire.  [Tr. 556-59].  Plaintiff's prognosis regarding hypothyroidism was favorable.  Dr. Mayzler identified her symptoms as chronic fatigue or lethargy, intolerance to heat and cold, dry skin, weakness and depression or anxiety.  He rated plaintiff's pain/paresthesia as moderate.  Dr. Mayzler identified the location of the pain as her hands, shoulders, neck, outer arms, and legs below the knees but did not identify the frequency of pain in any location.  [Tr. 556].

Dr. Mayzler opined that plaintiff's symptoms would frequently interfere with attention and concentration required to perform even simple work tasks and indicated that she would be unable to engage in public contact, perform routine repetitive tasks at a consistent pace, perform detailed or complicated tasks or comply with strict deadlines.  [Tr. 557].

Plaintiff's medications cause her to feel drowsy.  [Tr. 557].  Again Dr. Mayzler indicated that plaintiff can sit for more than two hours at one time, but for less than two hours in an eight-hour workday.  She can sit or stand for only fifteen minutes at one time and for less than two hours in an eight-hour workday.  [Tr. 557-58].

Plaintiff requires a job that permits her to shift at will among sitting, standing and walking.  She requires unscheduled breaks of 15-20 minutes every 1-2 hours.  Plaintiff can lift less than ten pounds occasionally and no greater amounts.  [Tr. 558].  Plaintiff has significant limitations in repetitive reaching, handling and fingering; she can do so only 15% of time during an average workday.  Plaintiff also can twist or bend only 5% of the time during an average workday.  Plaintiff should avoid exposure to extreme heat and cold, high humidity, fumes and dusts, soldering fluxes, solvents and cleaners, and chemicals.  Dr. Mayzler noted that plaintiff's impairments were likely to produce good and bad days and would cause her to be absent from work more than twice a month.  [Tr. 558-59].

### 3.   Physical Activities Questionnaire

Dr. Mayzler completed a Physical Activities Questionnaire on June 18, 2012.  [Tr. 561-63].  He indicated plaintiff's diagnoses were depression, anxiety and fibromyalgia and her prognosis guarded.  Dr. Mayzler continued to state that plaintiff can sit for more than two hours at one time, but for less than two hours during an eight-hour workday.  She can sit or stand for only fifteen minutes at one time and for less than two hours during an average workday.  Plaintiff requires a job that permits shifting at will among sitting, standing and walking.  [Tr. 561].

Plaintiff will need to take unscheduled breaks lasting 15-20 minutes every 1-2 hours.  [Tr. 561-62].  She can lift less than ten pounds occasionally and never any greater amount. Plaintiff has significant limitations in repetitive reaching, handling and fingering; she can do so only 15% of time during an average workday.  Plaintiff also can twist or bend only 5% of the time during an average workday.  [Tr. 562].  Plaintiff should avoid exposure to extreme heat and cold, high humidity, fumes and dusts, soldering fluxes, solvents and cleaners, and chemicals.  Plaintiff can occasionally twist and climb stairs but never stoop, crouch or climb ladders.  Dr. Mayzler noted that plaintiff's impairments were likely to produce good and bad days and would cause her to be absent from work more than twice a month.  [Tr. 563].

### 4.   **Disability Reports**

Agency staff completed disability reports when plaintiff applied for benefits.  The forms were completed on June 20, 2011, [Tr. 178-95]; and October 17, 2011, [Tr. 196-206; 215-224].

Plaintiff was last insured for DIB on December 21, 2011. [Tr. 178]. The first interview was conducted face-to-face.  The reviewer noted that plaintiff had difficulty with understanding, coherency, concentrating, talking and answering.  [Tr. 179]. Plaintiff identified her disabling conditions as hypothyroidism,

Lyme disease and diabetes. [Tr. 182]. Plaintiff stated that she stopped working on December 31, 2010. [Tr. 182]. She worked as a housekeeper from January 1999 through March 2000, and as a companion from 2001 through December 2010. [Tr. 183; 190]. As a companion, plaintiff cooked, cleaned, shopped for groceries and did laundry. She frequently lifted ten pounds and had to lift her employer who weighed about 200 pounds. [Tr. 191]. As a housekeeper, plaintiff cooked, cleaned and did laundry. She frequently lifted ten pounds and lifted up to twenty pounds. [Tr. 192]. At the time of the interview, plaintiff was being treated for mental and physical complaints and was taking the following medications: Abilify, Benicar, Fluoxetine, Levothyroxine and Metformin. [Tr. 185].

The second interview was conducted in association with plaintiff's appeal of the agency denial of benefits. The reviewer noted no difficulty with any listed tasks. The reviewer noted that plaintiff had a poor memory and became teary a few times during the interview. [Tr. 197]. Plaintiff stated that, in addition to the disabling conditions she included in the first form, she was now depressed. This change occurred in June 2011. [Tr. 199]. Plaintiff stated she had received new medication from her primary care physician, but did not list any different medications. [Tr. 200-01]. Plaintiff stated that her conditions make her sad and she does not feel like doing

anything.  She stays at home.  [Tr. 202].

### 5.  __Consultative Examinations__

On September 7, 2011, Dr. Firooz Golkar completed a medical consultative examination.  On September 30, 2011, Dr. Edgardo Lorenzo completed a psychiatric consultative examination.  [Tr. 54-57; 63-66].

Dr. Golkar stated that plaintiff had multiple somatic complaints without any specific physical findings.  Her hypothyroidism can be controlled with medication without imposing any physical limitations.  He noted that the record contained no evidence of any physical limitations resulting from Lyme disease and considered plaintiff's complaints of myofacial pain insignificant and not disabling.  [Tr. 55; 64].

Dr. Lorenzo evaluated plaintiff's affective disorders.  He noted only mild restrictions of activities of daily living, no difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace and no repeated episodes of decompensation.  Dr. Lorenzo noted that plaintiff's concentration, persistence and pace improved when she was on medication and opined that her primary issues were medical. [Tr. 56; 65].  The consultants determined that plaintiff's condition was not expected to remain severe enough for twelve consecutive months to prevent her from working.  Thus, they

found plaintiff not disabled.  [Tr. 57; 66].

### 6.   Activities of Daily Living Questionnaire

On October 21, 2011, plaintiff completed an Activities of
Daily Living Questionnaire.  [Tr. 207-14; 225-32].  Plaintiff
lives alone in an apartment.  She cares for no other persons or
pets.  [Tr. 207; 226].  She described her day as taking her
medications, trying to take a shower, resting, trying to eat,
attending medical appointments and resting.  Sometimes she goes
to the grocery store.  [Tr. 207; 226].  Plaintiff stated that
she has trouble falling asleep and wakes a few times during the
night.  She takes "some time" to get dressed, but needs no
assistance with dressing, bathing, caring for her hair and
bodily functions or eating.  She needs no reminders to care for
herself.  [Tr. 208; 225].

Plaintiff listed her medications as:  Abilify, Fluoxetine,
Clonazapam, Metformin, Levothyroxine, Trilipix, Terbinafine and
Benicar.  She was not certain whether the medications were
helping her because she always feels the same.  [Tr. 209; 228].

Plaintiff prepares her own meals consisting of salads,
soups and sandwiches.  She does not cook because she cannot
stand in front of the stove for a long time.  She spends 30
minutes to an hour weekly preparing meals.  Before her
illnesses, she loved to cook.  [Tr. 209; 228].

Plaintiff stated that she does light cleaning for 20-30 minutes each day and does laundry once a month.  She cannot vacuum.  Plaintiff needs to "push" herself to do these tasks. Plaintiff stated that she has aches and pains all over her body. She frequently is dizzy and her muscles shake.  She rarely drives a car; most of the time she is driven by others. Although she is able to go out alone, she prefers to have someone with her.  [Tr. 210; 227].

Plaintiff shops for groceries weekly.  She cannot remain in the store for very long before feeling panicky.  She has not shopped for other items for a long time.  Although she is able to handle her finances, she forgets to pay her bills.  [Tr. 211; 230].

Plaintiff has no hobbies or interests since her illness. Before that, she traveled and socialized with friends.  [Tr. 211; 230].  Now, she does not want to see anyone and gets irritable with others.  [Tr. 212; 229].  Plaintiff stated that her illness affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs.  It also affects her memory and concentration as well as her ability to complete tasks and get along with others.  [Tr. 212; 229].  Plaintiff could not say how far she could walk before resting but indicated she did not walk a lot because of leg pain.  Her attention span depended on how she was feeling.  She does not

always complete what she starts and needs instructions to be repeated a few times.  Plaintiff stated that she cannot handle stress and tries to avoid stressful situations.  Changes in routine make her confused and unhappy.  She gets disoriented when in public.  [Tr. 213].

### IV.  HEARING TESTIMONY

Plaintiff, represented by counsel, testified before ALJ Ronald Thomas on September 4, 2012.  [Tr. 34-49].

Plaintiff came to the United States from Estonia in 1996. She has two adult children, a son living in Estonia and a daughter living in Connecticut.  Plaintiff graduated from college in Estonia, but has no special job training or licensure in the United States.  [Tr. 38].

Plaintiff lives alone.  She has a driver's license but does not own a car.  [Tr. 38].  Plaintiff testified that she worked as a homemaker and companion but had to stop working because she experienced pain and fatigue.  [Tr. 39].  Plaintiff stated that she experiences dizziness and panic attacks which prevent her from speaking.  She has nearly constant pain in her legs, hands, shoulders and back.  [Tr. 39, 40].  In addition to her primary-care doctor, plaintiff sees a cardiologist, a psychologist and a therapist.  [Tr. 39].

Plaintiff stated that her doctor referred her to the emergency room.  The doctors at the emergency room ran tests but found nothing wrong.  Plaintiff could not remember how frequently she went to the emergency room.  [Tr. 41].  Plaintiff

stated that she experiences pain or pressure in her heart and described her "muscles shaking like screw." [Tr. 42].

Plaintiff testified that she has difficulty getting up in the morning and sometimes cannot sleep. [Tr. 41]. She does not get up in the morning about three days a week. When she gets up, she sits on the porch for a few minutes, and then goes inside. [Tr. 42].

Plaintiff stated that her friend takes her shopping for groceries a few times a month. Plaintiff is afraid to ride in the car because she thinks someone might kill her. Plaintiff shops for groceries late in the evening when there are few people in the grocery store. [Tr. 43]. Plaintiff attends church about once every three weeks but does not socialize with any parishioners. [Tr. 44]. She sees only her one friend. She does not watch television or do anything for enjoyment. [Tr. 44]. Plaintiff speaks with her son on Skype and has a Facebook page. [Tr. 46-47]. She testified that sometimes she cannot remember things and must "think a long time." [Tr. 48].

Plaintiff stated that she has not travelled for many years and has no hobbies. [Tr. 46]. In 2005 or 2006, plaintiff went to Estonia. While there, she saw a doctor and had her thyroid gland removed. Plaintiff stated that she did not believe the diagnoses of her doctors in Connecticut regarding her thyroid. [Tr. 47].

## V.   LEGAL STANDARD AND SCOPE OF REVIEW

This Court's review of the Commissioner's decision is limited.  The Commissioner's decision may be set aside only due to legal error or if it is not supported by substantial evidence.  See 42 U.S.C. § 405(g) (providing that the Commissioner's factual findings are conclusive if supported by substantial evidence); Yancey v. Apfel, 145 F.3d 106, 110–11 (2d Cir. 1998).  "Substantial evidence" is less than a preponderance but "more than a mere scintilla" and as much as "a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  "Thus, as a general matter, the reviewing court is limited to a fairly deferential standard."  Gonzalez ex rel. Guzman v. Commissioner, 360 F. App'x 240, 242 (2d Cir. 2010) (summary order) (citing Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)).  If the decision of the ALJ evinces legal error or is unsupported by substantial evidence, the Act provides that the "Court shall have the power to enter . . . a judgment . . . reversing a decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

To be considered disabled under the Act and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified (in her application, she claimed January 1, 2011) "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." Id.;
§423(d)(1)(A).  Such impairment or impairments must be "of such
severity that [s]he is not only unable to do [her] previous work
but cannot, considering [her] age, education, and work
experience, engage in any other kind of substantial gainful work
which exists in the national economy." Id. § 423(d)(2)(A); see
also 20 C.F.R. § 404.1520(c) (requiring that the impairment
"significantly limit [ ] . . . physical or mental ability to do
basic work activities" to be considered "severe").

There is a familiar five-step analysis used to determine if
a person is disabled.  See 20 C.F.R. § 404.1520.  In the Second
Circuit, the test is described as follows:

> First, the [Commissioner] considers whether the
> claimant is currently engaged in substantial gainful
> activity.  If he is not, the [Commissioner] next
> considers whether the claimant has a "severe
> impairment" which significantly limits his physical or
> mental ability to do basic work activities.  If the
> claimant suffers such an impairment, the third inquiry
> is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix
> 1 of the regulations.  If the claimant has such an
> impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such
> as age, education, and work experience . . . .
> Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual
> functional capacity to perform his past work.
> Finally, if the claimant is unable to perform his past
> work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry
v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))
(alterations in original).

Through the fourth step, "the claimant carries the burdens
of production and persuasion, but if the analysis proceeds to

the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform" given what is known as her "residual functional capacity." Gonzalez, 360 F. App'x at 243 (citing Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam)). "Residual functional capacity" is what a person is still capable of doing despite limitations resulting from her physical and mental impairments. See 20 C.F.R. §416.945(a).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978). "[E]ligibility for benefits is to be determined in light of the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." Id. (quotation marks and citation omitted).

### VI. ALJ'S DECISION

In this case, the ALJ undertook the prescribed five-step analysis and concluded that plaintiff was not disabled. After finding, at step one, that she had not engaged in any substantial gainful activity since January 1, 2011, [Tr. 22], the ALJ determined that plaintiff had the following severe impairments: hypothyroidism, Lyme disease, diabetes mellitus,

depression and anxiety. [Tr. 23]. At step three, the ALJ concluded that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." [Tr. 23].

Since the ALJ found that plaintiff was not disabled *per se* at step three, he proceeded to step four, which is to identify her "residual functional capacity," or "RFC." The ALJ found that plaintiff retained the RFC to perform: "A full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to only occasional interaction with the public, coworkers, and supervisors; and she can only occasionally bend, stoop, twist, squat, kneel, crawl, climb, or balance." [Tr. 24].

Based on this assessment at step four, the ALJ found that plaintiff could not perform any of her past relevant work. [Tr. 28]. Finally, at step five, after considering plaintiff's age, education, work experience and RFC, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that plaintiff can perform. [Tr. 28].

## VII. DISCUSSION

On appeal, plaintiff asserts the following arguments for remand:

1. The ALJ's failure to call a vocational expert is inconsistent with agency policy;

2. The ALJ improperly failed to include any limitation of

concentration, persistence or pace in his mental RFC

assessment;

3. The ALJ failed to find the diagnosis of fibromyalgia a

severe impairment;

4. The ALJ's failure to find the diagnosis of fibromyalgia a

severe impairment is not harmless error.

The Court will consider plaintiff's arguments below in the

order they arise in the five-step review process.

**A.   *Diagnosis of Fibromyalgia***

Plaintiff argues that the ALJ erred by failing to find that

fibromyalgia was a severe impairment.

> Fibromyalgia is characterized by the
> presence of chronic widespread pain and
> tactile allodynia.  While the criteria for
> such an entity have not yet been thoroughly
> developed, the recognition that fibromyalgia
> involves more than just pain has led to the
> frequent use of the term "fibromyalgia
> syndrome."  In addition to muscular pain and
> stiffness, this ailment can also cause
> fatigue, sleep problems, depression, and an
> inability to think.  Other symptoms
> associated with fibromyalgia are headaches,
> nervousness, numbness, dizziness, and
> intestinal disturbances.  The disorder is
> not directly life-threatening.

Montanez v. Astrue, No. 07 CV 1039(MRK)(WIG), 2008 WL 3891961,

at *8, n.5 (D. Conn. Aug. 1, 2008) (citing

http://www.emedicinehealth.com/fibromyalgia/article--em.htm;

http://en.wikipedia.org/wiki/Fibromyalgia).

Evaluation of fibromyalgia as an impairment is governed by

SSR 12-2p, 2012 WL 3017612 (S.S.A. Jul. 25, 2012).  Before

fibromyalgia may be considered a medically determinable

impairment, there must be appropriate medical evidence from a

medical or osteopathic physician.  To find that fibromyalgia is
a disabling impairment, the ALJ must assess objective evidence.

> We cannot rely upon the physician's
> diagnosis alone.  The evidence must document
> that the physician reviewed the person's
> medical history and conducted a physical
> exam.  We will review the physician's
> treatment notes to see if they are
> consistent with the diagnosis of
> [fibromyalgia], determine whether the
> person's symptoms have improved, worsened,
> or remained stable over time, and establish
> the physician's assessment over time of the
> person's physical strength and functional
> abilities.

2012 WL 3017612, at *3.

The elements of one of two tests must be present.  The
first test is based on the 1990 American College of Rheumatology
("ACR") Criteria for the Classification of Fibromyalgia.  The
elements are:  (1) a history of widespread pain; (2) at least 11
positive tender points on physical examination; and (3) evidence
that other disorders that could account for the symptoms or
signs were excluded.  2012 WL 3017612, at *3-4.  The second test
is based on the 2010 ACR Preliminary Diagnostic Criteria.  The
elements are:  (1) a history of widespread pain; (2) repeated
manifestations of six or more fibromyalgia symptoms, signs or
co-occurring conditions; and (3) evidence that other disorders
that could cause these repeated manifestations were excluded.
2012 WL 3107612, at *5-6.

Dr. Mayzler provides no objective evidence to support his
diagnosis of fibromyalgia.  The two progress notes in which he
makes the diagnosis are from dates on which he did not even
examine plaintiff.  Although the form on which Dr. Mayzler's

42

progress notes are recorded includes spaces for evaluation of the musculoskeletal system, at no time did Dr. Mayzler indicate the presence of musculoskeletal pain in the notes.  [Tr. 294-95; 320-22; 416-28; 494-95].  A conclusory diagnosis is insufficient to warrant a finding that fibromyalgia is a serious impairment in this case.

SSR 12-2 explains that to test tender-point sites, "the physician should perform digital palpation with an approximate force of 9 pounds."  2012 WL 3017612, at *4.  Although Dr. Mayzler did examine plaintiff, there is no evidence that he tested tender-point sites in the manner required.  The record does contain a record of the pain management consultation where Dr. Bull noted the presence of tenderness at 11 of the 18 sites and indicated that the pain was consistent with fibromyalgia. This consultation occurred in March 2011.  Plaintiff did not see the consultant again and there is no other reference to tender-point sites in the record.  [Tr. 275; 291; 297; 490].  Dr. Mayzler did not follow-up the consultative report with testing to document a diagnosis of fibromyalgia and did not even suggest a diagnosis of fibromyalgia until April and May 2012, over a year later.  [Tr. 416, 418].  Further, Dr. Mayzler does not explain his reasons for changing the diagnosis from "?Fibromyalgia" to "Fibromyalgia" over a two week period or his failure to even note the possibility of a fibromyalgia diagnosis when he saw plaintiff between the dates of the two references.

Plaintiff was diagnosed with Lyme disease, one of several disorders that could account for her symptoms.  See 2012 WL

3017612, at *4 n.7.  There are no medical records showing that
Lyme disease was excluded as the source of plaintiff's symptoms.

In light of the absence of objective evidence required to
find that fibromyalgia was a medically determinable impairment,
the ALJ's failure to include fibromyalgia as a severe impairment
was not erroneous.  The Court notes that the ALJ did acknowledge
the references to fibromyalgia in plaintiff's medical history.

**B.    *RFC Assessment***

Plaintiff challenges only one aspect of the ALJ's RFC
assessment.  She argues that the RFC assessment is deficient
because the ALJ failed to include any reference to mental
limitations of concentration, persistence or pace.  She notes
that the ALJ found moderate limitations of concentration,
persistence and pace in his analysis at step 2, but included no
limitation of concentration, persistence and pace in his RFC
assessment at step 4.

The Commissioner argues that the RFC assessment is correct
and well-supported.  The Commissioner refers to a 2012 letter
from Dr. Mayzler stating that plaintiff's Lyme disease and
hypothyroidism were well-controlled and do not impede her
ability to work.  The cited letter, [Tr. 510], however, was
written in December 2010, not December 2012, as the Commissioner
represents.  Thus, the letter does not reflect plaintiff's
medical condition at the time of the RFC assessment.

The Commissioner argues further that the ALJ performed the
required analysis and that his RFC assessment is supported by
substantial evidence because it is consistent with the opinion

44

of plaintiff's treating psychiatrist.

The ALJ concluded that plaintiff has the RFC "to perform a full range of work at all exertional levels but with the following non-exertional limitations:  the claimant is limited to only occasional interaction with the public, coworkers and supervisors; and she can only occasionally bend, stoop, twist, squat, kneel, crawl, climb, or balance." [Tr. 24].  In reaching this assessment, the ALJ considered all of the objective evidence submitted to support the three impairments plaintiff identified in her applications as limiting her ability to work:  hypothyroidism, Lyme disease and diabetes.  [Tr. 24].

At step 3, the ALJ reviewed the limitations identified in paragraphs B and C of the adult mental disorder listings.  These limitations are used to rate the severity of a mental impairment.  In considering these limitations, the ALJ noted the severities identified by plaintiff and her mental health treatment providers.  He applied no weight to the statements and made no credibility determinations.  Considering all of the statements, he noted that plaintiff had only moderate limitations of concentration, persistence and pace, which was insufficient for a finding of disability at step 3.  [Tr. 23].

The assessment performed at step 3, is not as detailed as the assessment performed at steps 4 and 5.  See Karabinas v. Colvin, ___ F. Supp. 2d ___, 2014 WL 1600455, at *8 (W.D.N.Y. Apr. 21, 2014) (citing SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. Jul. 2, 1996).  At step 4, the ALJ considered the weight to be applied to the treating physicians' opinions and whether

plaintiff's complaints were credible.  The Court concludes that
the difference in assessment of limitations resulting from
application of the different standards is not, in and of itself,
erroneous.

Plaintiff argues that "*every* limitation described as part
of the 'paragraph B criteria' must be translated into a detailed
assessment and limitation in the RFC finding."  Doc. #22 at 15.
Plaintiff provides no authority for this statement.  The
regulations require the ALJ to consider all of plaintiff's
impairments and limitations in making his RFC assessment.  It
does not require him to make a detailed finding regarding each
one.  See 20 C.F.R. §§ 404.1545; 416.945.

SSR 85-16 provides that "all limits on work-related
activities resulting from the mental impairment must be
described in the mental RFC."  1985 WL 56855, at *2 (1985).  The
ALJ included the weighted opinion evidence in making his RFC
assessment.  A review of the decision shows that the ALJ
considered all of the alleged limitations in making his RFC
assessment and included those limits that affected plaintiff's
work-related activities in his assessment.  As the Commissioner
points out, the limitations included are consistent with the
opinion of plaintiff's treating psychiatrist.  The Court
concludes that the assessment is not improper because the ALJ
failed to list each possible limitation in the assessment.

Although she does not assert separate arguments challenging
the ALJ's application of the treating physician rule and his
credibility assessment, plaintiff challenges these

determinations in the context of her challenge to the RFC
assessment.   The Court considers these challenges below.

### 1.   **Treating Physician Rule**

Under the treating physician rule, the ALJ gives deference
to the opinions of the physician who has engaged in the primary
treatment of a claimant.   See Burgess v. Astrue, 537 F.3d 117,
128 (2d Cir. 2008); 20 C.F.R. § 404.1527(d)(2).   The treating
physician rule requires that the views and medical opinions of
the treating physician be given controlling weight, provided
that they are supported by objective medical evidence and "not
inconsistent with other substantial evidence in the case
record."   Id.   "The regulations further provide that, even if
controlling weight is not given to the opinions of the treating
physician, the ALJ may still assign some weight to those views,
and must specifically explain the weight that is actually given
to the opinion."   Schrack v. Astrue, 608 F. Supp. 2d 297, 301
(D. Conn. 2009) (citing Schupp v. Barnhart, No. Civ.
3:02CV103(WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12,
2004)).   If the ALJ's opinion is not supported by objective
medical evidence or is inconsistent with other substantial
evidence in the record, the ALJ need not give the opinion
significant weight.   See Poupore v. Astrue, 566 F.3d 303, 307
(2d Cir. 2009).

Here, plaintiff has two treating physicians, Dr. Mayzler,
an osteopathic physician, and Dr. Naungayan, a psychiatrist.
The doctors offer different versions of plaintiff's mental RFC.

The ALJ accepted the assessment of Dr. Naungayan, her primary mental health treatment provider, over that of Dr. Mayzler. That determination is consistent with the treating physician rule.

### a.   Dr. Mayzler

The ALJ noted that the severity of the limitations asserted by Dr. Mayzler was not supported by and was inconsistent with the record medical evidence.  Thus, he gave minimal weight to the Dr. Mayzler's opinion.  [Tr. 27].

The only time Dr. Mayzler offered an opinion regarding plaintiff's limitations was on June 18, 2012, when he completed three questionnaires.  [Tr. 552-55; 556-59; 561-63].  In each questionnaire, Dr. Mayzler stated that the impairment being evaluated, diabetes, hypothyroidism and the combination of her impairments, caused the same restrictive limitations.  Each questionnaire contained the same contradiction.  Dr. Mayzler stated that plaintiff can sit for longer than two hours at one time but cannot sit for more than two hours total in an eight-hour workday.  In addition, there are no medical records suggesting any limitations attributable to diabetes.  Dr. Mayzler provides no objective medical evidence to support the limitations he describes and his progress notes reflect cursory examinations and often include as his assessment a repetition of plaintiff's complaint.  See Tr. 294 & 494 (Feb. 28, 2011 - plaintiff complained of depression and chest pain; diagnosis was hypertension, depression and chest pain); 424 (Dec. 5, 2011 - plaintiff complained of generalized pain; diagnosis was

48

depression and non-specific generalized pain); 417 (May 4, 2012
– plaintiff complained of leg pain; diagnosis was lower
extremity pain).  Although he includes several physical
limitations in his assessment, Dr. Mayzler provides no objective
evidence to support any physical limitation.  The lack of
objective medical evidence supporting Dr. Mayzler's assessment
of plaintiff's limitations supports the ALJ's decision to afford
his opinion minimal weight.  In addition, the ALJ credited the
opinion of the treating psychiatrist regarding mental
impairments, her area of specialty, rather than the opinion of
plaintiff's internist.  See Orts v. Astrue, No. 5:11-512, 2012
WL 6803588, at *5 (N.D.N.Y. Nov. 14, 2012) ("treating source
opinion can be rejected for lack of underlying expertise, or
when it is brief, conclusory and unsupported by clinical
findings, or when it appears overly sympathetic such that
objective impartiality is doubtful and goal-oriented advocacy is
reasonably suspected" (citations omitted)).

### b.   Dr. Naungayan and Mr. Pernice

The ALJ gave significant weight to the opinions of Dr.
Naungayan, the treating psychiatrist, and Mr. Pernice, the
treating social worker.  He noted that the record evidence
showed a significant treating relationship with plaintiff and
their opinions were consistent with and supported by the record
evidence.  [Tr. 27].

The mental health treatment records document biweekly
meetings and show improvement from the initial evaluation.
Although Dr. Naungayan and Mr. Pernice state that plaintiff's

attention and concentration remain compromised, they conclude that plaintiff retained the capacity to interact with others appropriately in a work environment.  She was considered well-organized cognitively with the ability to initiate and complete tasks.  Plaintiff could carry out single-step instructions and would have only a slight problem carrying out multi-step instructions, focusing long enough to complete assigned simple activities or tasks, and changing from one simple task to another.  [Tr. 339-41].

Plaintiff points to her initial mental health evaluation where she complained, *inter alia*, of low energy, lack of motivation, difficulty with short term memory and concentration, anxiety and suicidal ideation.  [Tr. 378].  Over the course of her treatment, Dr. Naungayan noted improvement with the prescribed medication.  While plaintiff continued to be anxious and depressed, the progress notes support this assessment of improved capacity.  Plaintiff also states that, in a March 2012 letter signed by both mental health treatment providers, Mr. Pernice characterized plaintiff as "fit[ting] a profile of individuals who experience profound psychiatric symptoms  in response to a traumatic event or ongoing situational stress." [Tr. 355].  Mr. Pernice made this statement in connection with plaintiff's history of reporting to the emergency room with complaints of chest pain where there is no medical pathology.

Although plaintiff reported to the emergency room complaining of chest pain several times, there is no evidence that these incidents would prevent her from engaging in the

activities described by Dr. Naungayan in the mental impairment
questionnaire.

In evaluating a mental limitation, the ALJ credited the
opinions of the treating psychiatrist and social worker which
were supported by medical records over the opinion of the
treating internist whose opinion was not supported by objective
medical evidence.  See 20 C.F.R. §§ 404.1527(c)(5) &
416.927(c)(5) ("We generally give more weight to the opinion of
a specialist about medical issues related to his or her area of
specialty that to the opinion of a source who is not a
specialist.").  The Court concludes that the ALJ did not
misapply the treating physician rule.

### 2.  **Credibility**

The ALJ found plaintiff's statements not credible to the
extent they were inconsistent with the RFC assessment.  The ALJ
is required to assess the credibility of plaintiff's subjective
complaints.  20 C.F.R. §416.929.  Where the claimant's testimony
concerning pain and functional limitations is not supported by
objective evidence, the ALJ retains the discretion to determine
the plaintiff's credibility with regard to disabling pain and
other limitations.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.
1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

The courts of the Second Circuit follow a two-step process.
The ALJ must first determine whether the record demonstrates
that the plaintiff possesses a medically determinable impairment
that could reasonably produce the alleged symptoms.  20 C.F.R.
§416.929(a) ("[S]tatements about your pain or other symptoms

will not alone establish that you are disabled; there must be
medical signs and laboratory findings which show that you have a
medical impairment(s) which could reasonably be expected to
produce the pain or other symptoms alleged and which, when
considered with all of the other evidence (including statements
about the intensity and persistence of your pain or other
symptoms which may reasonably be accepted as consistent with the
medical signs and laboratory findings), would lead to a
conclusion that you are disabled.").  Second, the ALJ must
assess the credibility of the plaintiff's complaints regarding
the intensity of the symptoms.  Here, the ALJ must first
determine if objective evidence alone supports the plaintiff's
complaints; if not, the ALJ must consider other factors laid out
at 20 C.F.R. §416.929(c).  See, e.g., Skillman v. Astrue, No.
08-CV-6481, 2010 WL 2541279, at *6 (W.D.N.Y. June 18, 2010).
These factors include: (1) the claimant's daily activities; (2)
the location, duration, frequency and intensity of the
claimant's pain; (3) any precipitating or aggravating factors;
and (4) the type, dosage, effectiveness, and side effects of any
medication taken by claimant to alleviate the pain.  20 C.F.R.
§416.929(c)(3)(i)-(iv); 20 C.F.R. §404.929(c)(3)(i)-(iv).  The
ALJ must consider all the evidence in the case record.  SSR 96-
7p, 1996 WL 374186, at *5 (Jul. 2, 1996).

Furthermore, the credibility finding "must contain specific
reasons . . . supported by the evidence in the case record, and
must be sufficiently specific to make clear to the individual
and to any subsequent reviewers the weight the adjudicator gave

to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.  "Even if subjective pain is unaccompanied by positive clinical findings or other objective medical evidence, it may still serve as the basis for establishing disability." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010) (citation omitted).  "Put another way, an ALJ must assess subjective evidence in light of objective medical facts and diagnoses." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988).

The ALJ is not "required to credit [plaintiff's] testimony about the severity of [her] pain and the functional limitations it caused." Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008).  "[T]he ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.'" Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

SSR 96-7p, 1996 WL 374186, at *3 (S.S.A. July 2, 1996).

The ALJ considered plaintiff's statements regarding her limitations and found them not credible to the extent alleged.

He found that plaintiff's activities of daily living contradicted her statements that she could only rest and attend medical appointments.  Plaintiff lived alone and attended to her physical needs.  She cooked and shopped for groceries weekly. She cleaned her apartment daily and did laundry monthly.  She sometimes attended church and spoke with her son in Estonia on Skype.  [Tr. 46; 209-11; 227-30].  The Court concludes that the ALJ's credibility assessment is supported by substantial evidence.

The ALJ was not required to mention every piece of evidence in his decision.  See Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) (where evidence of record permits court "to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or to have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability").  The ALJ's RFC assessment comports with the opinion of plaintiff's treating psychiatrist and the objective medical evidence in the record.  The Court concludes that the ALJ's decision is supported by substantial evidence.

**C.** *Failure to Call Vocational Expert*

Plaintiff argues that the ALJ was required to call a vocational expert.  Where the Grid cannot be used, either because nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, testimony from a vocational expert is generally used to support

a finding that employment exists in the national economy which the claimant can perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

"Vocational expert testimony is required only if a claimant's 'nonexertional limitations . . . significantly limit the range of work permitted by his exertional limitations.'" Lewis v. Colvin, 548 F. App'x 675, 678 (2d Cir. 2013) (quoting Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010)).  To be considered significantly limiting, a nonexertional impairment must "so narrow a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  Zabala, 595 F.3d at 410-11.

In his RFC assessment, the ALJ stated that plaintiff is limited to "only occasional interaction with the public, coworkers and supervisors; and she can only occasionally bend, stoop, twist, squat, kneel, crawl, climb, or balance."  [Tr. 24].  "Occasionally" can mean anything from very little to one-third of the time.  See SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983).  Thus, when restricting a claimant to occasional activity, the ALJ must indicate whether the limitation restricts the claimant's ability to find meaningful employment.  See Selian v. Astrue, 708 F.3d 409, 422 (2d Cir. 2013).

The ALJ found that plaintiff's "ability to perform work at all exertional levels has been compromised by nonexertional limitations[,]" but those limitations "have little or no effect on the occupational base of unskilled work at all exertional

levels." [Tr. 28].  Because the ALJ did not find a significant
limitation, he did not err in relying on the Medical-Vocational
Guidelines to determine that jobs exist in the economy that
plaintiff could perform.

**D.**   ***Failure to Find Fibromyalgia a Severe Impairment Not Harmless Error***

Plaintiff's final argument is based on a finding that the
failure to find fibromyalgia a severe impairment was error.  As
the Court has concluded that the ALJ did not err, it need not
consider this argument.  To the extent that this argument may be
construes as a challenge to the ALJ's application of the
treating physician rule, the Court has considered the treating
physician rule in connection with its discussion of the ALJ's
RFC assessment.

**VIII.    CONCLUSION**

For the reasons stated, Plaintiff's Motion for Summary
Judgment **[Doc. #18]** is **DENIED**.  Defendant's Motion for Order
Affirming the Decision of the Commissioner **[Doc. #20]** is
**GRANTED**.

In accordance with the Standing Order of Referral for
Appeals of Social Security Administration Decisions dated
September 30, 2011, the Clerk is directed to transfer this case
to a District Judge for review of the Recommended Ruling and any
objections thereto, and acceptance, rejection, or modification
of the Recommended Ruling in whole or in part.  See Fed. R. Civ.
P. 72(b)(3) and D. Conn. Local Rule 72.1(C)(1) for Magistrate

Judges.[3]

    ENTERED at Bridgeport this  5th day of November 2014.


                              _____/s/_____
                                  HOLLY B. FITZSIMMONS
                      UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).